Good morning, Judge Clement, and may it please the Court, Paul Andrasik on behalf of the BP defendants. We respectively submit that this case turns on one overarching question, and that is that the Supreme Court mean what it said in Dudenhofer when it fashioned a new pleading standard for arrested employer stock drop cases based on inside, non-public information. In particular, did the Court require ERISA plaintiffs to allege facts that plausibly indicate that a prudent fiduciary could not have concluded that to propose alternatives to continued investment would do more harm than good to the plan as a whole? And did it require plaintiffs to address that standard, to make that showing on the face of the complaint to avoid dismissal? We submit that the answer to those questions is yes. That is precisely what the plain language of the Dudenhofer decision says. And while the plaintiffs continue to quibble with the plain meaning of that language, we don't have to guess, because the Supreme Court addressed these same issues again earlier this year in the Amgen case, only 18 months after Dudenhofer. In Amgen, the Supreme Court summarily reversed a Ninth Circuit decision upholding a stock drop complaint. That complaint alleged that the defendants had breached their fiduciary duties by failing to pursue the same alternatives that are at issue in this case, a public disclosure of on the basis of that inside knowledge. The Ninth Circuit sustained that complaint, finding that those alternatives would not result in undue harm to plan participants. Supreme Court, of course, summarily reversed. The Supreme Court made clear that simply identifying those alternatives was not good enough, even where a parallel securities fraud case against the same defendants had withstood a motion to dismiss. Rather, the Court reiterated that under Dudenhofer, even in that context of a sustained securities fraud case, the plaintiffs had to meet the more harm than good standard. They had to allege alternatives that a prudent fiduciary could not have concluded would do more harm than good, and they had to do so in the face of the complaint. We submit that once it's determined that the Supreme Court meant what it said in Dudenhofer, the outcome of this appeal should be clear. The District Court decision should be reversed. As a threshold matter, Judge Ellison simply failed to apply the proper standard in permitting plaintiffs to amend their complaint. In allowing the case to proceed, he never determined that the complaint plausibly alleged that a prudent fiduciary could not have concluded that the plaintiffs' proposed alternatives would do more harm than good to the plan as a whole. Rather, he addressed an entirely different question, a question which he did not resolve. He allowed the complaint to proceed because, in his words, he could not determine on the basis of the pleadings alone that no prudent fiduciary would have concluded that the plaintiffs' proposed alternatives would do more good than harm. No, that's not the test. That a prudent fiduciary might have viewed the proposed alternatives as beneficial, as resulting in more good than harm, is simply not enough. Dudenhofer established a far more stringent standard. We agree with you that the District Court applied the wrong standard. Should we just say that and send it back for him to evaluate whether their alternatives meet that standard, or should we go ahead and … Well, the alternatives, Your Honor, do not meet that standard. And I think Judge Ellison made that clear himself. In the interlocutory certification? In the interlocutory certification. He reviewed the allegations in this complaint, and he concluded that if the standard was, as we suggest, as the Supreme Court stated in Dudenhofer and reaffirmed in Amgen, that the case was over, that the plaintiffs had not met the more harm than good standard. And frankly … And for the alternative of basically cutting off investment in BP stock with the fund, I see some different things in your brief. One, you say that could have been viewed as something harmful because it would have kept retirees from pulling their money out. Sure. It would have been frozen. You couldn't sell the stock in which some of them are living off of. You also seem to be saying that the drop in that stock price that would have likely immediately occurred would have harmed all the investment that was already in the fund. Which of these? Is it all of them? Which of these? You seem to be saying different things. Which are the real harms? Well, I think the real focus has to be, as the Supreme Court said, on what impact would the alternatives have on the existing stock held by the plan? Would they cause a concomitant drop in the value of that stock? I think it's clear they would here because they really have two alternatives. Their alternative one is making a market disclosure, and that really wasn't their principal alternative below. Their principal alternative was cutting off any future purchases, and they said that you should do that without making a market disclosure, that you could do it secretly, without telling the participants themselves, and without telling the market as a whole. And secondly, they suggested that while the secret, well the basis for the suspension was secret, that the existing shareholders, the existing plan participants, could continue to sell their stock at the inflated price. I think they were focusing on those, on that factor, because they recognize that if there was a market disclosure, it wouldn't necessarily cause the stock, the existing block of stock held by the plan, to fall in value. And that was a very... What about the efficient market theory that the Ninth Circuit discussed in Amgen, and I don't think that was, you know, ruled upon by the Supreme Court, where they said, it's going to come out eventually, the price is going to go down, how do you respond to that? I think the Supreme Court did respond to that issue in the Amgen decision. Number one, the Ninth Circuit essentially inferred that early disclosure was always good, that it was better to flush out the inflation, if you will, because that was, that would benefit the plan participants. If the Ninth Circuit was right, if that was a proper inference, then every stock drop complaint would get by the Dudenhofer Standard. If early disclosure is always good, then the Dudenhofer Standard means nothing. And I would also direct the Court's attention to the brief filed by the Solicitor General in the Dudenhofer case itself, particularly at pages, I believe it's 28 and 29, of that brief, where the Solicitor General essentially made the argument that early disclosure was always good, because you would flush out that inflation, you'd get the stock to the right price, and you should do that as quickly as possible. Supreme Court didn't adopt that standard. They said you have to do more. Even where you can show that there is artificial inflation, or allege that there's artificial inflation. They didn't express, is that Solicitor General opinion discussed anywhere in the Supreme Court's opinion? I mean, I understand you're saying they didn't adopt that there, but they didn't acknowledge it or reject it? I don't think they acknowledged it, but I think that they implicitly rejected it, because why else would you require the more harm than good standard? Because every stock drop case, every one, and I've done a lot of them over the years, has the notion that the stock is artificially inflated, and that you have a duty fiduciaries to stop the plan from acquiring that stock at the artificial price. If the Supreme Court and the Solicitor General said that allegation was sufficient to make out an ERISA stock drop claim, Supreme Court just didn't adopt that standard. They could have adopted that standard very easily. They said there had to be more, and that more was plausible allegations that a prudent fiduciary could not have concluded that the alternatives would do more harm than good. What about one of the alternatives that Judge Ellison actually rejected? The plaintiff said that the fiduciaries could have increased the liquidity buffer, the amount of cash, and Judge Ellison said he didn't get into the more harm than good. But he just says, well, that would have been violating their obligations to the plan because there's a 5 percent limit on how much cash you can have in there. And they say it actually says, you know, you can have more than 5 percent, and that that would meet the standard because it wouldn't have these issues of decreasing the stock price. Your Honor, I don't think that would have had any meaningful impact here, but I think Judge Ellison was certainly correct. It seems odd that the plaintiff's position is that fiduciaries should disclose more, that here they could fulfill their duties by doing something secretly. They would have been changing the nature of the plan investment because the plan investment stated why that liquidity buffer was in place. It was only supposed to be in place as necessary to allow daily trading of the stock. But beyond that, if the fiduciaries of the plan, of course, the fiduciaries, the defendants in this case, really, they made no investment decisions themselves. This was totally a plan, a participant-directed investment program. They decided when to buy, and they decided when to sell. If the fiduciaries of this plan had interjected themselves into the process in this fashion and said, no more purchases because, secretly, we have inside knowledge and we think based on the inside knowledge that we have, the plan shouldn't invest any further in the stock, that would have been a violation of the insider trading rules. I think that's the clear implication of what the SEC said in its amicus brief in this case. They would be taking action. They would be interfering in the process based on inside information. That's a violation of the rules. Your Honor, I see I have time left. Our point is that if you strip it all away, the alternatives the plaintiffs have put forward all suffer from the same defect. They ignore harm. They ignore the harm to the plan's huge block of company stock, and that harm would have occurred because any of the alternatives they put forward do require a market disclosure of adverse inside information, and by definition, that disclosure of adverse inside information would cause the stock to fall. And this complaint simply has no factual allegations that goes into a comparative analysis and suggests why that inevitable decline in the value of the stock would not have outweighed any prospective benefit that the plan would have had if they were permitted to buy stock at a cheaper price. Your Honor, I'll reserve the rest of my time for rebuttal. Mr. Kravitz. Thank you, Your Honors. May it please the Court, Ron Kravitz on behalf of the appellees. Your Honors, the express language of ERISA, Section 404, the Judenhofer decision itself the briefs filed by, the amicus briefs filed by the Secretary of Labor, the Department of Labor, and the SEC, as well as the amicus brief filed by AARP, all support Judge Ellis's decision in allowing plaintiff's complaint to go through, to pass the motion to dismiss standard. And why is that? Because we allege plausible claims of a breach of fiduciary duty. I think a lot of our discussion today will center around the efficient market theory and what happens when there's a disclosure. A lot has actually evolved in the employer stock area since we were here three years ago. The Munch presumption was tossed. Twenty years of jurisprudence relating to that standard was gone. And the Supreme Court, in the Judenhofer decision, struck the presumption of prudence and strongly said there's no presumption in ERISA. And what the defendants are trying to argue here, what the appellants are arguing, is that we now are creating a new presumption. And Judge Ellison actually stated in his opinion that defendants read Judenhofer as creating a new presumption, a presumption that the alternatives, such as freezing the company's stock fund or disclosing insider information, would cause more harm than good. This is this hypothetical drop in the corpus of the fund, that the plan would lose more as a result of this disclosure. And that's based on an inefficient market theory. And I think where that's derived from is the old Munch standard, where there was not a disclosure of the reason why the plan was frozen. But now we know from the amicus brief filed by the SEC that if the fiduciary is elected to freeze the company's stock fund, they're going to stop the purchases and they're going to stop the sales. There has to be a disclosure. There has to be an AK file that's going to tell the participants why there is a freeze on the company's stock fund. There is no basis to infer that that's going to cause a drop in the stock of the price any more than what the market should cause it to drop. It will achieve its correct price. There's not going to be an overreaction or an overcorrection. And if we take that assumption, what will happen is the plan is going to stop purchasing inflated shares of stock. The participants are no longer going to be paying too much for their shares of the BP stock fund, because the inflation is going to be taken out of the fund. And what happens in our case is that in ERISA there's the duty, for example, of procedural prudence. What should have happened here is that the fiduciaries of the BP stock fund consisted of very high-level executives, including Mr. McKay, for example, who was the chief of the investment committee, high-level officer responsible for the Gulf of Mexico. We allege had insider material information that should have been disclosed to the public. Mr. Shaw, Mr. Dupree, same thing. We also allege Mr. Hayward was a fiduciary. Later, Judge Ellison rejected our theory on that. But he remains a designated officer under the plan. So all the players in our case are very high-level senior officials with inside material information that should have been discussing this fact in their investment committee meeting. And what should they be discussing? They should be discussing, how do we protect the plan participants? That's our job, we're fiduciaries. Our position is that they have to stop the purchase of inflated shares. They have to disclose this harmful information, even under the Kujanic standard in the Fifth Circuit. The job of the fiduciary is to protect the plan participants, and they know if they don't disclose this information, they will be causing harm to the plan participants. What's very unique about our case is that we also have a plan structure, which is actually set up in a way perfectly to provide for this disclosure through the SEC disclosure process. Now, why is that? If you focus on Section 6.3 of the plan, the investment committee, Mr. McKay and the others, can direct the designated officers, Mr. Hayward, to freeze or limit the company stock fund, which would trigger, based on the SEC's amicus brief, this requirement that full disclosure, with regard to the material information that's not being disclosed, will be provided to the public. So this strips away a good part of the defendant's arguments that we can't let the fiduciaries just run amok and make disclosures by themselves, we have two separate schemes of disclosure. That's not this case. We actually have a plan that structurally provides for the disclosure of information in a very methodical way and complying with the securities laws and the risk laws. Even though he ruled in your favor, I mean, I read the opinion as sort of the district court threw up his hands and said, this is my best guess, but I have problems with both sides' interpretation. And he said your view, which relies on this efficient markets theory that it's always better off to get the real market price out there. He basically says that would mean plaintiffs can always get these cases past the pleading stage, which is contrary to what the Supreme Court indicated. How do you respond to that with some sort of limiting principle that would still allow the weeding out of some of these cases? And we appreciate that, Your Honor. And we understand that there's a major focus on how do we stop the meritless cases going through to discovery and causing people to spend a lot of money in fighting cases that might not be worth it. That's not our case. And I think it goes to the unique facts and circumstances of our case. These will be case-specific determinations. And here we have, unlike J.P. Morgan, for example, unlike the Lehman Brothers cases, we have insiders on the investment committee with inside material information that should have been disclosed with regard to the safety process systems. We also have a circumstance where the materialization of that risk does not occur until 2010 when the Deepwater Horizon accident occurs. There's a three-year period. So this is a perfect case where factually the early disclosure allegations that we have in the complaint are plausible and make sense. In hindsight, it might have been the better thing, but I don't think you can factor the Horizon disaster into that. You have to look at back in 2007 or when this decision was made, disclose or not disclose as a fiduciary. At that time, could they have viewed it as doing more harm than good, not knowing that there's a risk of some kind of event but no certainty and certainly not something of the magnitude of the spill that happened? Let's go back into the investment committee meeting and what are they talking about. They're talking about disclosing that they're not installing this OMS process on contractor-owned rigs, for example. That's not going to cause a 50 percent drop in the stock of the price. That's material inside information. Judge Ellison has already found that to be material inside information. And the market will react in an efficient market way and cause the price to plummet and take the inflation out of the stock going forward. So there will be the early disclosure, and there's case law out there that supports the concept that early disclosure is better than late disclosure, and it mitigates reputational harm. And that's important in this case. Why? And we have a number of allegations in our complaint setting forth BP's well-known historical background of disasters and accidents and criminal actions and penalties. So when they come forward in 2007 and say, you know, we're going to make things right now, we're going to safety over profits, and we're going to install all of these safety systems, they don't do it. And then they come out and disclose to the market, by the way, we're not where we're supposed to be on the OMS system. We're going to do it, but we're not there yet. That disclosure may cause a negative reaction, but it's going to only go down as much as the efficient market would cause it to. It would go to its correct price. And instead what happened is participants continued for three years to purchase inflated shares. So our facts are very unique. It's not like the J.P. Morgan case where you have a rogue broker who causes a company to lose $6 billion, and by the time they discover it, that fact, that's over, and they're just disclosing that financial regularity. Our case is, it's a safety issue. They acknowledge they're not complying with the Baker recommendations, and they have an opportunity to fix it. They can actually issue an AK that will minimize the impact on the stock fund at that time. But they didn't do it. What cases since the Supreme Court decision and Dudenhoffer have found the pleading standards satisfied, other than the Ninth Circuit case that was vacated? There are not a lot of cases out there. There's actually two cases in Texas, of all places, at the district court level, the Invicare case and the Ramirez v. J.C. Penny case. Those are the two cases where courts found a plausible claim under the Dudenhoffer standard. And I would acknowledge, frankly, in all the cases post-Dudenhoffer, there is not a great deal of analysis with respect to why the courts found that they met that standard. And I would disagree with BP's counsel with respect to the Amgen Supreme Court's summary decision sending that case back down. My understanding of that is the Amgen underlying complaint was never amended post-Dudenhoffer to add the Dudenhoffer allegations to it. So I don't think it's really a good comparison. I don't think we really have a strong statement from the Supreme Court as to why they sent it back down, other than they have not had a chance to replead that case under the new standards. I think one of the other arguments that's important to stress here is, and we see this a lot in the employer's dock cases, is a lot of people say these are just securities cases in disguise, but they're not. And this is actually a perfect, again, a perfect example of why they're not. In the securities case, Judge Ellison did not certify the pre-spill class. So as we sit here today, the plan does not have a claim. A securities claim relating to the pre-spill class. They don't have a case. Whether the fiduciary should bring their own now is the question, frankly, and I would say that they should, because I think there's a plausible claim. But right now, the only thing that the plan has going for it is this ERISA claim. And why do they? I think it's important to look at who's the plaintiff. The plaintiff, we're representing a purported class on behalf of the plan, and we're suing defendant fiduciaries who are not defendants in the securities case. So we have a different plaintiff, a different set of defendants. We have different elements to state our claim. Duty, breach of fiduciary duty, losses to the plan. And there will be different insurance policies at play and different facts to support our cases. And different remedies, frankly. The remedies in the securities case is a 10B-5 action. There will be out-of-pocket losses in our case. It's more of a buck-four analysis. What would those dollars in the plan be invested in if they were invested imprudently, and what would they be worth today? So we have two different federal statutory schemes that are designed to handle cases like this. And there's not one that takes precedence over the other. In fact, we would argue that the ERISA one should take precedence, if anything, over the securities case with regard to our claims. Because, as we keep saying, the fiduciary duties under ERISA are the highest known to law. And I understand you to say that your ESOP claim is pre- and post-spill? That's correct, Your Honor. Okay. And there is a post-spill case that was certified. Excuse me. And there's also been a settlement announced in the securities case of $175 million. But I have not seen, I don't think it's public yet, the terms of that settlement and to what extent that settlement may encapsulate pre-spill claims. We just don't know. But as far as we know right now, there is no plan. There's about 150 or more opt-out securities cases that Judge Ellison is still handling today. And to my knowledge, the plan is not one of those. You've alleged that these shares were inflated, the BP shares were inflated. But before the Deepwater Horizon explosion, what would have allowed a prudent fiduciary to consider that they were overvalued or overpriced? What facts are you relying on or that they should have been relying on? Well, the facts would be, as we've alleged in the complaint, that there's material inside information that's not being disclosed. And we go through in our complaint what that information is. The list of potential changes that could have been made? No. The fact that, I guess it begins in the beginning of our complaint in paragraphs 9 to 11, 15 and 16, talking about the background history of BP, the Baker Report, and then the failure, the company's known failure to disclose those facts were known to our fiduciaries. You mean the safety, the potential safety provisions? Correct. Correct. And the ability to respond to a spill, a major spill. I think those are pretty well known now. There's never been one, right? Pardon? There's never been a major spill. I'm talking about before Deepwater Horizon exploded. They had spills and major disasters. And my recollection is their recovery plans, for example, they simply figured out that that might not work in Texas. They didn't go back to PUDO. Correct. Correct. They didn't come up with something. So none of that was disclosed. So the participants in the plan did not have the information available to them to make informed investment decisions, like the rest of the public. But particularly with respect to the plan, and I think we probably talked about it the last time we were here, but under 404C of ERISA, there is a So they can make informed investment decisions. Our participants, yes, they had the ability to trade, but they didn't have the right information to trade. And had they received the correct information, those are the kinds of things that may have dissuaded them from investing their retirement savings in BP stock. In other words, that the company is not prepared to handle spills, that the company is not complying with the Baker recommendations. So we have that. That's in our complaint. I could have stopped in participating in the ESOP. Could they have withdrawn their prior investments in the ESOP? The individual participants? Yes. Yes, they were free to trade in the plan, but they didn't have the correct information to trade. And so what we're proposing, and what the SEC and the DOL concur, is something that actually works under these circumstances. And it's kind of unique to our plan, where the disclosures could have been made. They could have been made through an 8K process. Mr. Hayward, even Mr. McKay, frankly, was a designated officer, could have caused these disclosures to be made to the world, and that would have taken care of the misrepresentation and the omissions that were occurring. And that occurred for three years. I mean, that's an important part of our case. This is not, you know, the earnings are overstated or we're channel-stuffing and that's over with. This is a three-year period of nondisclosures, and things only build. And this is why the early disclosure allegations that we have in our complaint, paragraphs 348 and 349, are also unique to our case. And it's not just speculation. We maintain, we comply with Iqbal Twombly's pleading standards. That is the pleading standard here, by the way. It's still Iqbal Twombly. We just take into consideration the Dudenhofer factors that the State acclaimed for breach of fiduciary duty. We have to allege lawful alternatives, and we do that. We allege a number of them, actually. We allege the freezing and disclosure, but we also allege the contacting the SEC and the DOL, whistleblower-type statutes. Now, Judge Ellison didn't agree with us on this point, but we maintain that's also a viable option. And here's a good example why, actually right now. Let's say the fiduciaries are aware of inside information not being disclosed, and they don't have the ability to cause a designated officer to disclose the information. And let's say they go to the officers of the company and say, you have to disclose this material information, and the officers say no. What are they supposed to do? The DOL and the SEC say, well, you can come to us under, like, a whistleblower-type claim, and that's an avenue of relief that a prudent fiduciary should do, which potentially could cause the plan to suffer, and that suffers greater loss as the hundreds of millions of dollars that this plan lost. It's a $3 billion fund. The stock was trading as high as, say, 60, went down to as low as 28, and has rebounded to maybe 34. In light of Amgem, do you still believe the district court articulated the right when it said a fiduciary could have believed that these alternatives would do more good than harm? Well, in light of Dudenhofer and Amgem, I'm not sure the Court used the best selection of words when it made that — when it wrote that decision. But if you read the decision and look at the underlying oral argument, we spent our entire time talking about the more — no more harm than good standard. And I think he was just frustrated with trying to understand how to articulate this standard. And I think when he wrote those words, I think it was more of a semantics, but he was finding a plausible claim given the circumstances we have today. But he — in his order certifying for an allocutory appeal, he says that if BP's right about what the standard is, you lose, the case is over. I take it you disagree with him on that. I mean, are you arguing even if they have the right view of the standard, that you can still meet it? I think we do meet it, yes, Your Honor. Yes, Your Honor. And I think — let's see, I have 43 seconds left. I just — I would conclude by saying if we're going to create a new standard here, if the Court finds in favor of BP, the Court will be creating a new presumption, and that is that the efficient market theory is not working here, that the stock is going to drop more, there's going to be some kind of disruption, they're not going to understand the disclosure. That defies the efficient market hypothesis, and there's no basis to do that here. And at a minimum, the fiduciaries have an obligation and an opportunity to stop further purchases of inflated shares. Judge Ellison notes, as you pointed out, that the standard would be insurmountable. Well, what is the point of even having this? If the Court buys BP's argument, they would be eviscerating the duty of prudence — there would be no duty of prudence left in ERISA should the Court find in favor of BP. I see I'm out of time, but I'm happy to answer more questions. Thank you. If I could just respond to a couple of the points that my friend just made. Number one, with respect to post-Dudenhofer cases, he mentioned two decisions that weren't in favor of the plaintiffs. One was the Invacare case, and one was the J.C. Penney case. Invacare was decided before the Supreme Court's decision in Amgen, and Invacare relied on the Ninth Circuit's decision in Amgen in sustaining that complaint. J.C. Penney was not an inside knowledge case. That case really dealt with what happens when you're dealing with public information. So that's not on forwards with the situation that we're dealing with here. It dealt with the other prong of the Dudenhofer standard. Other cases that go our way, the Reinhardt case dealing with Lehman Brothers, which we cite in our papers, there's also the J.P. Morgan case, which points out the flaws really in the complaint the plaintiffs have here because they have no facts to support the notion that the more harmed and good standard would be satisfied. If you look at their complaint, all they have is some generalities. They cite a law review article and some general statement that suggests early disclosure is always good. But if that's the type of factual allegations that meet Dudenhofer, every complaint gets inside the door. Now, with respect to whether we are suggesting a new presumption, we're not. What we're talking about is what did the Supreme Court establish in this case. The Supreme Court in Dudenhofer, reaffirmed in Amgen, indicated that there was a liability standard here. That liability standard is no prudent fiduciary could have reached that conclusion. Unless the plaintiffs can meet that liability standard, unless they can, in Iqbal Twombly terms, unless they can show that there is a plausible way to meet that standard on the face of the complaint, they lose because they have not come forward with the elements of the cause of action. And an element of the cause of action here is satisfying our formulation of the more harmed and good test. How do you respond to their argument that your view of that standard would have doomed, say, the Enron ERISA case? The Enron ERISA case never went to judgment from an ERISA perspective. These cases are really securities fraud cases in disguise. In our brief, we did cite some examples of where the Dudenhofer test could be satisfied, at least in our view. I'm a defense lawyer. I don't have to dream up their themes for these types of cases. And I'm sure there can be some extraordinary circumstances. But it would be odd if the Supreme Court had a standard that eliminated every single one of them. No. And we don't think they did, Your Honor, because, as we said, we pointed out some. And there could be situations, other extreme situations, where the value of the company was zilch so that it didn't really matter what happened. But we don't have that case here. We have a viable company that had an explosion occur, caused a lot of negative consequences to the company, which have been weathered. This is a viable company before the explosion in the Gulf. It's a viable company now. And the plaintiffs have to satisfy, as I said, the more harm than good standard. What you heard today was entirely new. This is a new argument, their argument that, well, purchases should have been stopped and sales would have been stopped, that there should have been a market disclosure of the fiduciaries. That wasn't the argument they made below. What they were suggesting below was that stock, the purchases should have been suspended, but you could have done that secretly, and you could have allowed the other participants in the plan to continue to sell their stock. That was their theory below. They got the SEC to come in with an amicus brief. And sometimes you have to watch what you ask for, because the SEC said their theory just didn't hold water, that it didn't pass the first prong of Dudenhofer, which is that your alternative must be consistent with the federal securities laws. I already addressed the question about whether the efficient market analysis saves the day for them. The Supreme Court had that issue before them in Dudenhofer in the form of the SG's case. They didn't buy it. But I would say that in this case, there was every reason to believe that there could have been a market overreaction if the type of disclosures they're talking about had occurred. Certainly after this bill occurred, you could expect a market overreaction if the fiduciaries of this plan came out and said this stock was unfit for consumption by our own employees. And before that, given the history of problems that BP had, if someone came in and suggested, the fiduciaries came in and suggested this company's not safe, there would have been an adverse market reaction. Thank you, Your Honor. All right. Thank you.